J. Evan Shapiro (SBN 218481)
eshapiro@taulersmith.com
Camrie Ventry (SBN 355853)
cventry@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 1100
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff Joseph Lynch*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSEPH LYNCH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>GREEN DOT CORPORATION, a Delaware corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR (1) COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; (2) UNJUST ENRICHMENT; (3) USE OF A TRAP AND TRACE DEVICE IN VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 638.51); (4) INTRUSION UPON SECLUSION** |

## INTRODUCTION

1. Plaintiff, on his behalf and on behalf of a class of similarly situated persons, brings this action against Defendant Green Dot Corporation ("Defendant" or "Green Dot"). Green Dot offers financial and banking products and services through its website, located at https://www.greendot.com/ (the "Website").

2. Defendant has installed and deployed data broker and social media/advertising platform software on its Website to secretly collect data about visitors to the Website, their devices, locations and activity to identify who they are, and target them with unwanted marketing. Further, the software facilitates the profiling of visitors, and the tracking of their internet browsing on a future basis, regardless of whether visitors have opened accounts on the social media/advertising platforms.

3. The data broker and advertising platform software on the Website facilitates the identification of individual visitors through a process referred to as "browser fingerprinting." The software enables fingerprinting by ***transmitting visitors' data to at least three data brokers and at least two social media/advertising platform***. In addition, the software facilitates the correlation of data collected during visits to the Website and its correlation with extensive external records that these third parties already have about most Californians. The correlation enables the creation or enhancement of profiles on individuals for commercial exploitation, including the sale of data about individuals.

4. Both Defendant and the third-party data collectors behind the software at issue benefit commercially and financially from this activity. Defendant benefits because collected visitor data, and the identification of visitors using that data, are used to, *inter alia*, assess, analyze and target specific visitors with ads for Defendant's products. The data collectors benefit because they can commercially exploit the data the software collects, including, in the case of data brokers, selling the data.

5. The collection and transmission of data commences before a visitor to the Website has any opportunity to either reject or consent to the use of cookies or tracking software.

6. Further, soon after the home page of the Website loads on a visitor's device, a banner offering to permit the visitor to "manage your own preferences" relating to "cookies and related technologies." The banner contains a hyperlink that prompts a pop up window captioned "Cookies and Related Technologies on This Site" to appear. The pop up purports to enable the visitor to "submit [their] preferences" to prevent or halt the use of cookies and technologies to which Defendant refers as "Advertising Cookies" on the Website. Plaintiff, like many other visitors to the Website, used Defendant's ***consent interface*** – consisting of the banner and the pop up – to reject the use of "Advertising Cookies" on the Website.

7. Defendant's representations regarding visitors' power to prevent or halt the operation of "Advertising Cookies" are fraudulent. Using the consent interface to reject the use of "Advertising Cookies" – cookies that share data with third parties who track individuals' future internet browsing and that facilitate the compiling of detailed profiles on individuals for commercial exploitation or sale – is ineffective. Some or all of the "Advertising Cookies" continue to operate on visitors similarly situated to Plaintiff, notwithstanding visitors' opting out of the use of such cookies on the Website. This continued operation results in third parties receiving additional data relating to visitors' activity on the Website, their devices and browsers.

8. Defendant's installation and use of data broker and advertising platform software without obtaining consent or authorization violated California Penal Code § 638.51, California's Trap and Trace Law. It also violated duties under applicable common law. Defendant's representations and omissions of material fact in its consent interface regarding visitors' ability to effectively prevent or halt the operation of "Advertising Cookies" on the Website form the basis of a claim for common law fraud, deceit and/or misrepresentation.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

10. Defendant Green Dot is a Delaware corporation that is headquartered in Provo, Utah.

11. This Court has specific personal jurisdiction over Defendant with respect to all claims asserted herein.

12. Through the Website, Defendant offers financial and banking products and services, including a variety of debit cards. The Website markets Defendant's products specifically to individuals located in and residing in California. Through a page on the Website, https://m2.greendot.com/locate, Defendant allows visitors from California to find specific locations where they can purchase Defendant's debit card products, by entering the name or zip code of a California location. The search mechanism also allows such visitors to locate ATM locations in California where they can use Defendant's banking services.

13. Defendant maintains ongoing commercial relationships with such California customers and residents. Defendant derives substantial revenue from California-based sales through its operation of the Website. Defendant deliberately reaches out to persons browsing the internet from locations in California, availing itself of its opportunity to conduct business in California through the Website.

14. As described more fully herein, Defendant, through the Website and the data broker software, reaches into the devices of Website visitors located in California, depositing code and cookies onto the browsers and devices of those visitors in connection with the statutory and common law violations alleged by

Plaintiff. Defendant intended and understood that such persons would suffer injury in California as a result of the actions underlying Plaintiff's claims, which involve deployment of the data broker software on the Website.

15. Defendant has partnered with one California-based data broker and two social media/advertising platforms to install and deploy the software at issue in this matter. Data broker The Trade Desk, Inc. ("Trade Desk") maintains its principal offices in Ventura, California. LinkedIn Corp. ("LinkedIn") is headquartered in Sunnyvale, California. Meta is headquartered in Menlo Park, California.

16. Defendant's effort to attract viewers from California to the Website is aided by campaigns it runs on platforms operated by Meta. The collection of visitor data by Meta code Defendant installed on the Website allows Meta to target visitors to the Website who use the Meta platforms with specific advertising. The advertising is frequently chosen based on those visitors' specific actions while on the Website.

17. Defendant's use of the LinkedIn code and advertising services is governed by a User Agreement that contains two provisions that tie this action to California. First, the User Agreement provides that any legal dispute between Defendant and LinkedIn relating to LinkedIn's code and services is governed by California law.[1] Second, it provides that all claims and disputes between Defendant and LinkedIn "can be litigated only in the federal or state courts in Santa Clara County, California, USA" and that Defendant "agree[s] to personal jurisdiction in those courts."

18. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; and (3) is subject to

[1] *See* https://www.linkedin.com/legal/user-agreement (last viewed 9/15/2026).

personal jurisdiction in this District because it has availed itself of the laws and markets within this District. In addition, a substantial part of the events or omissions giving rise to the claims herein occurred in this District, where Plaintiff resides and where he was located when he visited the Website.

## PARTIES

19. Plaintiff Joseph Lynch ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of this state, living in Richmond, California. Plaintiff maintains reasonable expectations of privacy when browsing websites.

20. Plaintiff identifies DOE Defendants 1 through 10 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

21. Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

22. Defendant owns and operates the Website, which sells financial and banking products and services.

23. Defendant runs marketing campaigns for its products and services on the social media/advertising platforms, LinkedIn and Meta. These campaigns appear on the "feeds" of subscribers to the LinkedIn, Facebook and Instagram platforms. A PDF showing the results of a search for Defendant's advertising on Facebook and Instagram conducted on September 15, 2026, using the website https://www.facebook.com/ads/library, is appended hereto as Exhibit 1.

24. Defendant has partnered with at least one registered California data broker, Trade Desk, in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors. Defendant has done this by installing code and tools proprietary to Trade Desk (the "Data Broker Code") on the Website.

25. Defendant has also partnered with social media/advertising platforms LinkedIn and Meta in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors. Defendant has done this by installing code and tools proprietary to LinkedIn and Meta (the "Social Media Code") on the Website.

26. The Data Broker Code and the Social Media Code (jointly the "Third-Party Code") deployed on the Website is designed to track and correlate visitors by capturing electronic impulses transmitted from the devices of visitors to a website on which it is deployed. The process initiated by the Trade Desk, LinkedIn and Meta identifies visitors through "browser fingerprinting." Fingerprinting allows data brokers like Trade Desk, and social media/advertising companies LinkedIn and Meta, to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including the visitor's geolocation, device information, identification and cross-referencing of malicious cookies installed on the visitor's devices, and other traits evident from the visitor's browsers.

**Browser Fingerprinting**

27. Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings gets transmitted to Trade Desk, LinkedIn and Meta? One would think that the sharing of such seemingly non-personal data cannot impact a visitor's life or experience. This assumption is simply incorrect.

28. The fact is that when you visit a website, ***and before you get to weigh in on whether you should be targeted with ads or identified***, hundreds of non-personal data points tell those data brokers and social media companies who you are.

(These data points are *usually* accompanied with information such as the webpage you viewed just prior to arrival, and geolocation data.) Data Brokers and social media companies may already have access to your name and email addresses, as well as other websites you have visited in the past, to combine and/or match with this incoming data from your device.

29. Examples of such data points are:

- Device type and configuration
- Browser type and version
- Operating system and version
- Screen resolution and color depth
- System language settings
- Time zone settings
- Installed fonts
- Installed browser plugins or extensions
- Device memory
- CPU class
- Canvas rendering characteristics
- WebGL rendering characteristics
- AudioContext processing characteristics
- Touch support and input capabilities
- Network connection type

30. To be clear, ***website operators*** require some of the data points at issue to render the contents of a page on a website on their visitors' devices. For example, a webpage will load properly on a visitor's screen only with information about a visitor's device characteristics and configurations, including screen size. What is being discussed here – and what is at issue in this action – is such data being provided, by a website operator's actions, to ***third parties not involved in operation of the website itself, or the rendering of the website's contents on the screens of***

***visitors.*** The third parties do not need the data to operate any website, or for any purpose other than to identify, target and track website visitors.

31. As explained in an article in the October 2025 issue of *Wired Magazine*:

> Your browser fingerprint is a collection of innocuous information about your PC that, ***when put together, is unique enough that it could identify an individual***. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when this data is bundled together that your fingerprint becomes unique.[2]

32. The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a form on a website.

33. In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[3] Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and

---

[2] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You: Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 8/26/2026).

[3] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last viewed 8/26/2026).

Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad behaviors, essentially establishing the relationship between web tracking and fingerprinting."[4] The Texas A&M University study confirms the ability of tracking software like the code at issue in this case to identify individual browsers, and therefore individuals, using non-personal data about devices and browsers: "Think of it as a digital signature you didn't know you were leaving behind. You may look anonymous, but your device or browser gives you away."[5]

**The Cycle of Third-Party Collection of Consumer Data and the Tracking of Consumers**

34. Collection of visitor data by entities such Trade Desk, LinkedIn and Meta – including collection by these entities of unique identifiers that the Third-Party Code assigns to visitors to the websites of companies like Defendant – enables ongoing tracking of website visitors as they visit new websites in the future. At the same time, the tracking of a person's internet browsing going forward provides more opportunities for data collection (and profile building) about an individual. This cycle aids the advertising and/or data monetization efforts of Trade Desk, LinkedIn, Meta and similar organizations.

35. As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

> Consumers are constantly tracked when they go online. Sephora, like many online retailers, allows third-party companies to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in

[4] *Id.*
[5] *Id.*

> Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a consumer puts in their "shopping cart," and even the precise location of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies and used for the benefit of other businesses, without the knowledge or consent of the consumer.

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora* Complaint"), at 2:2-13.

**Registered California Data Brokers**

36. Registered California data brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations. Data brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

37. Registered California data brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

38. Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The

data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

39. Data brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a data broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual: "We know who she is, what she watches, what she reads, and who she lives with. [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[6]

40. Given the amount of data available by way of California registered data brokers' practices, a company like Defendant has an incentive to partner with data brokers so that it can learn the identity of visitors in order to target them with specific marketing materials.

41. Here, Defendant partnered with Trade Desk, LinkedIn and Meta by installing the Third-Party Code onto the Website. Defendant allows Trade Desk, LinkedIn and Meta to access, use, and monetize the data provided by Defendant, in ways that remain undisclosed to the public.

**Trade Desk Code**

42. Trade Desk is a data broker that collects data to build profiles about individuals without their knowledge or consent in order to sell ads. Trade Desk's technology is so comprehensive that it allows for marketers to push ads to "a specific location, at a given time, in front of a particular Internet user."

---

[6] Lucas Ropek, "Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users," Gizmodo.com (March 15, 2025), available at https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last viewed 8/26/2026).

43. The Trade Desk code deployed on Defendant's site identifies a user by identifying their device and then matching this information with their database. According to Trade Desk, "[d]evices are identified through unique identifiers stored in cookies provided by device operating systems for advertising purposes, or are generated based on statistical algorithms applied to information about a device, such as the IP address and device type."

44. Simply by visiting a site with Trade Desk software deployed, Trade Desk is able to track user behavior across websites and apps using cookies, device fingerprints, and probabilistic matching. Trade Desk also connects a user's behavior across multiple devices (e.g., mobile, desktop, TV) to a single identity.

45. Trade Desk's business depends on identifying website users without their knowledge. In fact, Trade Desk has stated publicly that their business depends on "ingesting more identifiable information" about individuals. Such information would include information of visitors to Defendant's Website transmitted to Trade Desk due to the deployment of Trade Desk code on the Website.

46. The Trade Desk code deploys tracking cookies that are dropped on visitor's devices to follow users across the web. Cookies are pieces of software code placed by Trade Desk and stored on a user's web browser. Cookies allow Trade Desk to "distinguish between, recognize, and store data about unique web browsers and devices, and to store data on [Trade Desk's] servers[.]". The cookies further allow Trade Desk to "recognize web browsers across sites and over time, and therefore to record information about them over time." Trade Desk cookies store and cause the transmission of a unique identifier that enables Trade Desk (and other entities with access to the cookies) to track users as they navigate a website, and any subsequent website where the cookies appear.

47. Plaintiff was subjected to the Trade Desk code as described *supra* starting when he requested that the Website load on his device on July 23, 2026.

## LinkedIn Code

48. LinkedIn is an advertising juggernaut. It earns billions each year through advertising its customers' products and services on the LinkedIn social media platform. To accomplish this, it must collect tremendous amounts of data from individuals browsing the internet, identifying them, and building (and later enhancing) profiles on them.

49. Defendant installed and configured the LinkedIn code on its Website to enable covert identification, tracking, and profiling of unsuspecting visitors by LinkedIn for Defendant's benefit, all without visitors' knowledge or consent.

50. LinkedIn's own promotional materials for the LinkedIn code explicitly state that the technology "unlocks powerful demographic insights about your website visitors, including their job titles, companies, industries, and more."

51. The LinkedIn code installed on the Website collects and relies on device- and browser-related data that seems merely technical and innocuous but that are frequently used to confirm a website visitor's identity. These include such minor things as browser type, version, and configuration settings, operating system architecture/version information, and display characteristics such as screen resolution and color depth. As alleged supra, an individual can be identified based on such data, particularly when a company like LinkedIn has the individual's approximate location.

52. The LinkedIn code specifically targets data elements that create unique digital signatures for individual users, including Plaintiff and members of the putative class. The LinkedIn code causes an identifier (LinkedIn Ads ID, li_adsid) to be added into visitors' browsers (which exist on their devices) that is "persistent" – meaning it can last months or even years after the visitor's visit to a website ends. The persistent identifier(s) loaded onto a visitor's browser on her device links her visits to different websites, what she buys on them, pages she selects to view, and information she enters to a unified advertising profile of her. This profile is used to

track when she makes purchases and to target her with ads for a website operator's products when she goes to other websites. This is referred to as "retargeting."

53. LinkedIn also represents to customers like Defendant that it uses the profiles to reach visitors across devices. Defendant installed this software on its Website to enable reliable visitor identification and long-term tracking across multiple website sessions.

54. LinkedIn explains that installing the code "creates cookies" and a first-party pseudonymous identifier on visitors' browsers, supporting LinkedIn's ability to build website audiences for retargeting and to perform conversion tracking tied to member accounts.

55. LinkedIn publicly discloses to potential customers like Defendant that the "Personalized Advertising" cookies part of the LinkedIn code include:

(a) UserMatchHistory, used for an ID synchronization process and storing the last sync time;

(b) li_sugr, used to make a probabilistic match of a website visitor's identity; and

(c) _guid, used to identify a LinkedIn member for advertising through Google ads (relevant where the visitor is a LinkedIn member and the cookie is applicable).

56. The UserMatchHistory cookie, using the persistent identifiers that are loaded onto a visitor's device by the LinkedIn Software, allows LinkedIn to match up visits to different websites that deploy the LinkedIn code and tie them to a single individual.

57. Defendant's decision to deploy LinkedIn's tracking code on the Website integrates Defendant's Website into LinkedIn's advertising identity-matching and audience-building ecosystem.

58. By deploying the LinkedIn code, Defendant actively facilitates the immediate transmission of harvested identifying information from visitors' devices

to LinkedIn's servers, including domains such as px.ads.linkedin.com, www.linkedin.com/px/, and snap.licdn.com. LinkedIn itself identifies (at minimum) snap.licdn.com and px.ads.linkedin.com as domains associated with the LinkedIn Software operation. Defendant configured the LinkedIn Software to automatically route data and signals that contain a visitor's data to LinkedIn's infrastructure.

59. Plaintiff was subjected to the LinkedIn code as described *supra* starting when he requested that the Website load on his device on July 23, 2026.

**Meta Code**

60. Meta is a digital advertising behemoth, earning approximately $196.2 billion in advertising revenue in 2025 alone. It leverages data about consumers it receives because of Meta code installed and deployed on the websites of companies that seek to advertise on Meta platforms including Facebook and Instagram to produce its massive advertising haul. Meta code operates on approximately 9% of all websites worldwide.

61. The Meta code performs data collection, behavioral analysis, user retargeting, and analytics. It uses a sophisticated algorithm to track people, recently described by Meta whistleblowers as "absolutely relentless in the pursuit of people."

62. The Meta code allows Meta to obtain and store at least the following visitor data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).

63. Meta utilizes the data collected through the Meta code for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as ad targeting and retargeting, in which Meta uses the Meta code to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. The profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and

on other sites that are part of Facebook's audience network. Meta also uses the data for conversion tracking, in which Meta uses the Meta code to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter. Data is also used for "Audience Insights and Analytics," a feature by which Meta provides data to businesses on user demographics, interests, and behaviors across their sites and apps. Meta also uses the data for cross-device and cross-platform tracking, in which Meta uses the Meta code to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This feature ensures that advertisers can follow users across devices.

64. Plaintiff was subjected to the Meta code as described *supra* starting when he requested that the Website load on his device on July 23, 2026.

**Troubling Implications of Third-Party Data Sharing**

65. Companies using third-party tracking software – such as the Third-Party Code described *supra* – seek to minimize its surveillance abilities and uses. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would be particularly appealing to them. However, there is no guarantee that consumer data supplied to data brokers or social media platforms will be used solely for advertising purposes.

66. As Attorney General Bonta explained in the *Sephora* case:

> The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora utilizes third-party tracking technology without alerting

> consumers and giving them the opportunity to control their data, they deprive consumers of the ability to limit the proliferation of their data on the web.

*Sephora* Complaint, at 2:14-20.

67. As a data broker, Trade Desk can use data it received regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies. The same can be said of data they received regarding visits of members of the putative Class in this action.

68. A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[7]

69. There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[8]

70. Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[9]

---

[7] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last viewed 8/26/2026).

[8] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 8/26/2026).

[9] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 8/26/2026).

71. In February 2026, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[10] No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

72. The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[11]

73. In early March 2026, a news website reported about the existence of a U.S. Department of Homeland Security internal document revealing that Custom and Border Protection ("CPB") "bought data from the online advertising ecosystem to track peoples' precise movements over time …"[12]

**Data and Related Profiles of Consumers Have Economic Value**

74. The type of visitor data transmitted via the Website to Trade Desk, LinkedIn and Meta has economic value – as is obvious from the facts that these third parties create code to collect it, and that Defendant has installed the code on the Website. The value of this data – that of Plaintiff as well as that of members of the

---

[10] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 8/26/2026).

[11] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 8/26/2026).

[12] *CBP Tapped Into the Online Advertising Ecosystem To Track Peoples' Movements* (404 Media Mar. 3, 2026), available at https://www.404media.co/cbp-tapped-into-the-online-advertising-ecosystem-to-track-peoples-movements/ (last visited 8/26/2026); *see also Security News This Week: CBP Used Online Ad Data to Track Phone Locations* (Wired Mar. 7, 2026), available at https://www.wired.com/story/cbp-used-online-ad-data-to-track-phone-locations/ (last visited 8/26/2026).

Class on whose behalf Plaintiff has filed this action – was diminished by Defendant's deployment of the Third-Party Code on the Website.

75. The loss of anonymity that occurs through the type of visitor browser fingerprinting and subsequent tracking alleged herein imposes real costs on visitors to Defendant's Website, including Plaintiff and members of the putative Class in this action. For example, in 2025, the Federal Trade Commission found that many websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns and shopping history" to tailor consumer pricing.[13]

76. As recently explained by the Law Institute:[14]

> In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns,

---

[13] *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last visited 8/26/2026).

[14] https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 8/26/2026).

> payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about movements and habits. What makes identity information particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in marketing and product development. A complex ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.

77. There exists an established market for the type of personal data collected and transmitted through the Third-Party Code running on the Website – data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals' internet browsing. Defendant's surreptitious and unlawful transfer of personal information through the code on its Website diminished Plaintiff's and Class members' ability to participate in that

market on informed terms, including to exercise the choice of whether to withhold, limit, or exchange their personal data for value.

**Plaintiff's Visit on July 23, 2026**

78. After the homepage of the Website loaded onto Plaintiff's computer during his July 23, 2026 visit, Plaintiff encountered a banner stating: "This site uses cookies and related technologies, as described in our privacy policy, for purposes that may include site operation, analytics, enhanced user experience or advertising. You may choose to consent to our use of these technologies, or manage your own preferences." Below this statement, on the banner, appear two black buttons bearing white text. One reads, "Manage Settings." The other reads, "Accept All."

79. Plaintiff clicked on the "Manage Settings" button. This caused a pop up window to appear on his screen. An image of the pop up appears below:



80. The top of the pop up reads, "Cookies and Related Technologies on This Site." Below this caption appears an emblem for Defendant reading, "greendot bank." Below that appears the following text:

> Please choose whether this site may use cookies or related technologies such as web beacons, pixel tags, and Flash objects ("Cookies") as described below. You can learn more about how this site uses cookies and related technologies by reading our privacy policy linked below.

81. The pop up then identifies two types of "Cookies," referring to cookies or related technologies: "Required Cookies" and "Advertising Cookies." The latter category of cookies and related technologies, "Advertising Cookies," are described in the following fashion:

> These cookies are used to show you ads that are more relevant to you. We may share this information with advertisers or use it to better understand your interests. For example, Advertising Cookies may be used to share data with advertisers so that the ads you see are more relevant to you, allow you to share certain pages with social networks, or allow you to post comments on our site.

82. Underneath this text appears an arrow, indicating an expandable field, followed by the words "Detailed Settings." When one clicks on the arrow, a list of third parties, and cookies and technologies supplied by each of them and used on the Website, appears. The list includes cookies and technologies supplied by Trade Desk and Meta. Plaintiff asserts that the list should also include the LinkedIn code, because cookies and other technologies within the LinkedIn code share information with LinkedIn, an advertising company.

83. As indicated by the shading on the "Yes" button below the description of "Advertising Cookies," the default setting indicated on the pop up is that the visitor has agreed to the Website's use of these cookies and technologies.

84. During his July 23, 2026 visit, Plaintiff clicked on the "No" button directly to the left of the "Yes" button, changing the setting to indicate that he was

rejecting the use of the cookies and technologies included in the category "Advertising Cookies." Thereafter, Plaintiff clicked on the black button below the description of cookie categories bearing the words "Submit Preferences" in white text. By taking these actions, Plaintiff understood that he was exercising his choice to prevent or halt use of "Advertising Cookies" on the Website during his visit.

85. Once Plaintiff clicked on the "Submit Preferences" button, he was able to browse the Website as Defendant's consent interface disappeared from his screen. This was the case with all visitors similarly situated to Plaintiff.

86. After completing the consent interface, Plaintiff visited numerous pages of the website including pages containing content about Defendant's services and products.

**The Consent Interface Defrauded Plaintiff and Other Website Visitors**

87. As demonstrated with respect to Plaintiff's July 23, 2026 visit to the Website in a recording known as a "HAR File," after Plaintiff rejected "Advertising Cookies," the Data Broker Code and Social Media Code deployed on Defendant's Website described *supra* continued transmitting Plaintiff's personal information to third parties including Trade Desk, LinkedIn and Meta. That information included the pages on the Website he visited and data that, on information and belief, identified him. The information was collected for commercial uses by Defendant, Trade Desk, LinkedIn and Meta, including targeting Plaintiff and others with advertisements for Defendant's products and services. It was also collected by these third parties to build or enhance a profile of him, possibly for sale by Trade Desk to other third parties.

88. In other words, Plaintiff's exercise of his option to choose to continue browsing the Website without being subjected to "Advertising Cookies" had no impact on the operation of "Advertising Cookies" on the Website, including but not limited to operation of the Third-Party Code, during his visit.

89. The type of data that continued to be shared with Trade Desk, LinkedIn and Meta ***after*** Plaintiff rejected the use of "Advertising Cookies" was similar to the data transmitted to Trade Desk, LinkedIn and Meta ***before*** Plaintiff interacted with Defendant's consent interface. The same can be said of the data shared from visitors to the Website similarly situated to Plaintiff after they rejected the use of "Advertising Cookies" through Defendant's consent interface.

90. Defendant's consent interface as described herein led Plaintiff, and all Website visitors similarly situated to Plaintiff, to believe that the Website would not deploy the cookies and technologies referenced by Defendant in its description of "Advertising Cookies" that they had rejected by clicking the "No" Button found in the section of the pop up devoted to "Advertising Cookies," and then clicking the "Submit Preferences" button. Plaintiff, and such visitors, therefore relied to their detriment on (1) Defendant's representations about confirming their choices (or 'submitting their preferences') with respect to the use of "Advertising Cookies" on the Website, and (2) Defendant's omissions regarding the fact that some or all of the "Advertising Cookies" would continue to operate on the Website notwithstanding visitors' express rejection of them.

91. Defendant intended for such reliance to occur because Defendant profited through the continued operation of the Third-Party Code on the Website as to visitors who rejected the use of "Advertising Cookies" through Defendant's consent interface.

92. Defendant's misrepresentations and omissions about the ability of Plaintiff and other visitors to the Website similarly situated to Plaintiff to prevent or halt the use of "Advertising Cookies" through Defendant's consent interface in the manner used by Plaintiff, were known exclusively to, and actively concealed by, Defendant. The misrepresentations and omissions were not reasonably known to Plaintiff and members of the putative class. Further, Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken

by Plaintiff and putative Class members as to whether to remain on, and continue to use, the Website. The misrepresentations and omissions were material at the time made, because, when presented with Defendant's consent interface, Plaintiff and putative Class members had the option to leave the Website rather than be subjected to the "Advertising Cookies."

93. Defendant benefited and profited from its misrepresentations and omissions regarding the use of the "Advertising Cookies" because such misrepresentations and omissions, *inter alia*, permitted (and continue to permit) Defendant to market and advertise its products and services to Plaintiff and putative Class members in a more profitable and cost-effective manner.

## CLASS ALLEGATIONS

94. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons who, while located in California, visited the Website during the applicable limitations period, and (1) when interacting with Defendant's consent interface, clicked on the "No" button directly below the discussion of "Advertising Cookies," and thereafter clicked on the "Submit Preferences" button; and (2) remained on the Website.**

95. This action has been brought and may be properly maintained as a class action. There is a well-defined community of interest in the litigation and the proposed class is ascertainable.

96. NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

97. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual

members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant's actions violate California common or statutory law;

b. Whether Defendant's representations and omissions in its cookie consent interface were false when made;

c. Whether Defendant's representations and omissions were material to Plaintiff and Class members at the time they were made;

d. Whether Defendant intended to induce reliance by Plaintiff and Class members on its representations and omissions;

e. Whether Plaintiff and Class members are entitled to statutory damages;

f. Whether Plaintiff and Class members are entitled to punitive damages;

g. Whether Plaintiff and Class members are entitled to injunctive relief;

h. Whether Plaintiff and Class members are entitled to the disgorgement of unlawfully obtained data; and

i. Whether Plaintiff and Class members are entitled to the disgorgement of profits.

98. TYPICALITY: Plaintiff was subjected to the Third-Party Code running on the Website when he visited the Website on July 23, 2026; he rejected consent to the Website's deployment of "Advertising Cookies"; and he remained on the Website after such rejection. Further, information about his activity on the Website and data that identified him was transmitted to Trade Desk, LinkedIn and Meta, and

possibly other third parties, for fingerprinting, identification and tracking purposes. His claims are therefore typical of the Class.

99. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

100. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class member is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

### Common Law Fraud, Deceit and/or Misrepresentation

101. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

102. Defendant fraudulently and deceptively represented to Plaintiff and Class members that Plaintiff and Class members could choose to reject the use of "Advertising Cookies", and that such rejection would effectively prevent or halt the operation of "Advertising Cookies" on the Website during their visits.

103. The representations were false and deceptive, and omitted material facts, because after Plaintiff and the Class members rejected the use of "Advertising Cookies," the Third-Party Code continued to operate on the Website during their visits, transmitting the personal data of Plaintiff and the Class members to Trade Desk, LinkedIn and Meta for fingerprinting, targeting and other forms of commercial exploitation.

104. Defendant's misrepresentations and omissions about these facts were known exclusively to, and actively concealed, by Defendant. They were not reasonably known to Plaintiffs and Class members at the time they were made. Defendant knew, or should have known, how its Website functioned, and how the Third-Party Code deployed on the Website operated – including whether any changes to its operation occurred after a visitor rejected the use of "Advertising Cookies" using Defendant's consent interface in the manner Plaintiff did.

105. Defendant's misrepresentations and omissions about the ability of Plaintiff and the Class members to decline the use of "Advertising Cookies" were material when made because they concerned facts that were critical to the decision of Plaintiff and Class members whether to stay on and/or continue browsing the Website. Plaintiff and the Class members could have terminated their visits to the Website if they had learned that they would be subjected to "Advertising Cookies," causing information about their activities on the Website, and data that identified them, to be transmitted to third parties including Trade Desk, LinkedIn and Meta through the Website.

106. By making the misrepresentations and omissions, Defendant breached its duties to Plaintiff and the Class members. Defendant also profited from the breach, because the transmission of the information about Plaintiff and Class members through the Website's use of "Advertising Cookies" made Defendant's marketing and advertising more efficient and effective. Plaintiff believes that additional ways in which Defendant profited from the fraudulent and deceptive practices described herein will be revealed through discovery.

107. Defendant intended to induce Plaintiff and Class members to alter their positions to their detriment by informing them that they could use the Website without being subjected to the Website's use of "Advertising Cookies." Operating under the mistaken belief that they had rejected such use, and thereby had prevented or halted it, Plaintiff and Class members allowed more of their personal information

to be transmitted to third parties, including Trade Desk, LinkedIn and Meta, than they would have otherwise.

108. Plaintiff and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions. Such reliance was justifiable and reasonable. There was nothing to indicate to Plaintiff or Class members that Defendant's consent interface contained misrepresentations and/or fraudulent omissions.

109. Plaintiff and Class members were injured as a direct and proximate result of Defendant's misrepresentations and fraudulent omissions, and their reasonable and justifiable reliance thereupon. Their injuries include the loss of money and/or property. The data of Plaintiff and Class members fraudulently and deceptively transferred to Trade Desk have economic value. Defendant's fraudulent and deceptive use of "Advertising Cookies," resulting in the transmission and possible sale of the personal information of Plaintiff and Class members to third parties (including Trade Desk, LinkedIn and Meta), diminished the value of such information to Plaintiff and Class members. Further, Defendant's use of "Advertising Cookies" under the circumstances injured the right of Plaintiff and Class members to control the distribution of their personal information, and the ways in which that information has been used, and currently is being used, by third parties. The injuries to Plaintiff and Class members also include the unauthorized creation of detailed behavioral profiles of them due to Defendant's conduct; the mental anguish of Plaintiff and Class members from knowledge of secret monitoring of them by Defendant, Trade Desk, LinkedIn and Meta and other third parties; and the chilling of their free online expression and inquiry.

110. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's misrepresentations and omissions concerning the use of the Third-Party Code on the Website were made in a malicious, oppressive and willful manner. These misrepresentations and omissions were made in conscious

disregard of the choice made by Plaintiff and the Class members to reject the use of "Advertising Cookies" on the Website – cookies and technology that would transmit Plaintiff's and Class members' data to third parties for fingerprinting, identification and tracking and other forms of commercial exploitation.

## **SECOND CAUSE OF ACTION**

### **Unjust Enrichment**

111. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

112. Defendant intentionally aimed at increasing its sales and profits, improving its marketing and advertising while making it more cost-effective, through its misrepresentations and fraudulent omissions concerning the choice of Plaintiff and Class members to reject being subjected to "Advertising Cookies" on the Website that transmitted their data to third parties.

113. There is no legitimate business reason that justifies Defendant's use of misrepresentations and fraudulent omissions concerning the choice of Website visitors to reject being subjected to "Advertising Cookies" on the Website that transmitted their data to third parties to benefit Defendant financially and commercially.

114. Plaintiff and Class members conferred an economic benefit on Defendant through their decision to continue using the Website after they attempted to reject the use of "Advertising Cookies" on the Website.

115. Defendant has been unjustly enriched by its conduct at the expense of Plaintiff and Class members.

116. Defendant understood the economic benefit it received from its unlawful behavior with respect to Plaintiff and Class members. Indeed, Defendant engaged in the unlawful conduct alleged herein in order to obtain the economic benefit it received from Plaintiff and Class members – and from all other visitors to the Website.

117. It would be unjust for Defendant to retain benefits and profits it received based on the value of the information about Plaintiff and Class members shared by Defendant with third parties including Trade Desk, LinkedIn and Meta through the use of "Advertising Cookies." The data sharing resulting from the use of "Advertising Cookies" was achieved unlawfully and wrongfully, and without the consent of Plaintiff and Class members.

118. Plaintiff and Class members are entitled to restitution of the benefits so received by Defendant. Further, they are entitled to any amounts required to place them in the position they occupied prior to Defendant's deployment of "Advertising Cookies" on the Website (after Defendant had defrauded Plaintiff and Class members into believing that they had prevented or halted such deployment) to transmit their data to Trade Desk, LinkedIn and Meta, and other third parties.

## THIRD CAUSE OF ACTION

### Violations of California Trap and Trace Law, Cal. Penal Code § 638.51

119. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

120. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

121. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." § 638.50(c).

122. The Third-Party Code as deployed on the Website constitutes a trap and trace device under Cal. Penal Code § 638.50(c).

123. The "electronic communication" at issue in this case is the communication between the devices of Plaintiff and the Class members, on the one

hand, and the Website, an instrumentality of Defendant, on the other hand. "Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." Cal. Penal Code § 629.51(a)(2). The interactions of Plaintiff and Class members with the Website meet this definition.

124. The Third-Party Code is designed to identify the source of the electronic communications between the devices of Plaintiff and Class members, on the one hand, and the Website, on the other, by 'capturing' the electronic or other impulses emanating from the devices that are "incoming" to the Website. The "***sources***" of the electronic communications moving from the devices to the Website are ***Plaintiff and the Class members (including their devices)***.

125. Software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication" constitutes a trap and trace device for purposes of §§ 638.50-51. *See, e.g., Biglang-Awa-Castro v. SBE Restaurant Group, LLC*, 25VECV03590, 2026 Cal. Super. LEXIS 29752, at *3-4 (L.A. Co. Super. Ct. Apr. 16, 2026); *Schallert v. RocketGenius*, 25STCV35081, 2026 Cal. Super. LEXIS 25177, at *3-4 (L.A. Co. Super. Ct. March 24, 2026); *Hassid v. Alex & Ani, LLC*, 2026 U.S. Dist. LEXIS 11238, at *4-7 (C.D. Cal. Jan. 20, 2026); *Casillas v. Lucky Opco LLC,* 25STCV03961, 2026 Cal. Super. LEXIS 24132, at *5-6 (L.A. Co. Super. Ct. Jan. 5, 2026); *Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1030-32 (C.D. Cal. 2025); *Lewis v. Magnite, Inc.*, 2025 U.S. Dist. LEXIS 263675, at *39-42 (C.D. Cal. Dec. 4, 2025); *Santoro v. Lulu & Georgia, Inc.*, 25STCV11722, 2025 Cal. Super. LEXIS 84529, at *8-9 (L.A. Co. Super. Ct. Nov. 21, 2025); *Zhizhi Xu v.*

*Reuters News & Media, Inc.*, 25CV459918, 2025 Cal. Super. LEXIS 76169, at *8-10 (Santa Clara Co. Super Ct. Oct. 24, 2025); *Scarlett v. Future US, LLC*, CGC-25-621912, 2025 Cal. Super. LEXIS 56166, at *11-14 (S.F. Co. Super. Ct. Sept. 5, 2025); *Garon v. Keleops USA, Inc.*, 2025 U.S. Dist. LEXIS 170745, at *10-15 (N.D. Cal. Sep. 2, 2025); *Valenzuela v. Intersystems Corp.*, 2025 Cal. Super. LEXIS 42550, at *3-4 (Orange Co. Superior Ct. Aug. 4, 2025); *Riganian v. The Data Brokers Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at *30-32 (N.D. Cal. July 14, 2025); *Price v. Headspace, Inc.*, 2025 Cal. Super. LEXIS 27951, at *3-9 (L.A. Super Ct. Apr. 1, 2025); *Sanchez v. Glasscanopy, Inc.*, 2025 Cal. Super. LEXIS 18460, at *8-9 (L.A. Super. Ct. Feb. 28, 2025); *Heiting v. Fka Distrib. Co.*, 2025 U.S. Dist. LEXIS 20076, at *8 (C.D. Cal. Feb. 3, 2025); *Conohan v. Rad Power Bikes Inc.*, 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at *16 (C.D. Cal. Apr. 3, 2025); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 U.S. Dist. LEXIS 227378, at *6-10 (N.D. Cal. Dec. 12, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930-931 (N.D. Cal. October 21, 2024); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024).

126. Defendant did not obtain a court order before using or installing the Third-Party Code on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using this technology, which is designed to identify Plaintiff and the Class members, along with their devices, as the source of electronic communications between them, on the one hand, and the Website, an instrumentality of Defendant, on the other hand.

127. Defendant did not obtain the express or implied consent of Plaintiff or Class members to be subjected to the Third-Party Code operating on the Website, which transmitted the data of Plaintiff and Class members to Trade Desk, LinkedIn and Meta.

128. Defendant's conduct violating § 638.51 caused Plaintiff and the Class members significant injuries. These injuries include: Defendant's invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; the unauthorized creation of detailed behavioral profiles of them due to Defendant's conduct; their mental anguish from knowledge of the secret monitoring of them by Defendant, Trade Desk, LinkedIn and Meta; and chilling effects on their free online expression and inquiry due to Defendant's conduct.

129. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also Fandom,* 754 F. Supp. 3d at 932; *C2 Educ. Sys. Inc.*, 742 F. Supp. 3d at 1077-78.

130. Plaintiff and Class members are entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51.

## **FOURTH CAUSE OF ACTION**

### **Intrusion Upon Seclusion**

131. Plaintiff and Class members reallege and incorporate each allegation in all preceding paragraphs contained herein.

132. Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

133. Defendant's deployment of the Third-Party Code on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website. The intrusion allowed Trade Desk, LinkedIn and Meta to identify, profile and track (on an ongoing basis) Plaintiff and Class members.

134. Plaintiff and the Class members never authorized use of the Third-Party Code on the Website.

135. Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Defendant over the Website.

136. Defendant's intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website. Further, it was perpetrated for Defendant's economic benefit.

137. Deployment of tracking software that engages in the type of identification, profiling and tracking carried out by the Third-Party Code that Defendant installed on the Website forms the basis of an actionable intrusion upon seclusion claim under California law. *See, e.g., Caldwell v. InMobi Pte., Ltd.*, No. 25-cv-09977-AMO, 2026 LX 229530, at *7-14 (N.D. Cal. Apr. 29, 2026); *Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1029-30 (C.D. Cal. 2025); *Krzyzek v. Openx Techs., Inc.*, No. 25-cv-05588-SI, 2026 LX 42961, at *10-13 (N.D. Cal. Jan. 27, 2026).

138. The intrusion described herein would be highly offensive to a reasonable person.

139. Defendant's intrusion upon seclusion caused Plaintiff and the Class members significant injuries. These injuries include: Defendant's invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; the unauthorized creation of detailed behavioral profiles of them due to Defendant's conduct; their mental anguish from knowledge of the secret monitoring of them by Defendant, Trade Desk, LinkedIn and Meta; and chilling effects on their free online expression and inquiry due to Defendant's conduct.

140. Defendant's invasion of the privacy of Plaintiff and Class members damaged them. They are therefore entitled to compensatory damages, which includes monetary damages.

141. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the Third-Party Code on the Website was malicious, oppressive and willful. That use includes both the installation of the Code and the configuration of the Website to bypass what Plaintiff and the Class members believed were their actions effectively preventing or halting the use of "Advertising Cookies" on the Website. Defendant's actions were made in conscious disregard of the choice made by Plaintiff and the Class members to prevent or halt such use.

142. Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

## PRAYER

WHEREFORE, Plaintiff, on his behalf and on behalf of the Class members, prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and appointing Plaintiff's attorneys as Class Counsel;
2. An award of statutory damages pursuant to CIPA;
3. An award of punitive damages;
4. An award of nominal damages;
5. An order for full restitution;
6. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;
7. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;
8. Reasonable attorneys' fees and costs; and

9. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: September 16, 2026 TAULER SMITH LLP

By: ____________________
J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Joseph Lynch*

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: September 16, 2026 TAULER SMITH LLP

By: ______________________
J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Joseph Lynch*